UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Charlie Garrett,

    Plaintiff,

v.

Nancy A. Berryhill, Acting
Commissioner of Social Security,[1]

    Defendant.

No. 16 CV 50263

Magistrate Judge Iain D. Johnston

## MEMORANDUM OPINION AND ORDER

Plaintiff Charlie Garrett seeks social security disability benefits based on series of medical problems (abdominal and back pain being the chief two complaints) that he suffered from over the four-year period from 2010 to 2014. The administrative law judge ("ALJ") found plaintiff's statements about his problems were not credible and that he could do light work. The Court finds that the ALJ's conclusions were supported by substantial evidence and that any errors were harmless.

### BACKGROUND

In 2010, plaintiff was working as a cook in a fast food restaurant, but this job ended later in the year when he began serving a prison sentence. In 2012, he was released from prison. Soon thereafter, he sought medical treatment and also filed an application for disability benefits. His most immediate medical problem was abdominal pain and weight loss. His doctors detected a non-cancerous mass, and in October, surgery was performed to remove it. Plaintiff also complained about back pain, although this ailment was not the focal point at this time.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

A month after the surgery, plaintiff's primary care physician (Dr. Silva) completed a Rockford Township form so that plaintiff could obtain housing assistance. On this form, Dr. Silva listed plaintiff's diagnoses as hypertension and abdominal wall pain and opined that plaintiff could not work full-time, but that he could work part-time with the restrictions that he not lift over 10 pounds or bend frequently. In response to a question asking how long these limitations would be in force, Dr. Silva wrote "undetermined."

Despite the first surgery, plaintiff's abdominal pain continued. On February 5, 2013, a second surgery was performed by Dr. Prabhakar. On February 14, 2013, plaintiff visited Dr. Silva for a follow-up. Plaintiff did not mention any problems with his abdomen, but rather stated the following, as summarized by Dr. Silva:

> [Patient] states in the last few weeks, he has fallen and "passed out" a few times. When asked to describe the incidents, he states he could not remember what happened during those times. He feels knees are weak and tend to give out. He now uses a cane to assist with walking. [Patient] states his meds at home are incomplete but could not identify which ones are missing.

R. 295. This appears to be the first time in the medical records indicating that plaintiff was using a cane. Aside from smoking, Dr. Silva identified plaintiff's only problem as being near syncope (fainting) and observed that there was an "unclear etiology" for this problem. R. 295.

Plaintiff visited Dr. Silva a few weeks later, complaining about pain around his incision site and stating that he saw "yellow drainage." R. 293. Dr. Silva listed plaintiff's ailments as hypertension (referred to as the primary issue) and pain at the surgical incision.

On March 22, 2013, plaintiff visited Dr. Silva and reported fatigue, weak legs, and a "tingling sensation on [both] legs all the way down to [his] feet." R. 291. Plaintiff told Dr. Silva that the leg problem had gradually been worsening the last several weeks and made it difficult to walk without a cane. On examination, Dr. Silva found that plaintiff had normal motor strength in

upper and lower extremities and normal sensation. *Id.* In the treatment section, Dr. Silva wrote: "No signs of weakness in legs today. Unclear etiology of transient weakness reported by patient." *Id.* This same day, Dr. Silva completed a second Township form in which he listed plaintiff's diagnoses as constipation and leg tingling. He again stated that plaintiff could not work full-time but could work part-time if limited to no lifting over 20 pounds and no bending. As for how long these limitations would be in force, he wrote "2-3 months." R. 415.

On April 10, 2013, a state agency physician, Dr. Gotway, concluded that plaintiff, although having degenerative disc disorder, nonetheless could work subject to certain limitations. Ex. 3A. Dr. Gotway relied on earlier medical reports and cited observations such as plaintiff having normal motor strength and a negative straight leg raising test. R. 77, 78.

On April 22, 2013, plaintiff saw Dr. Silva and complained about arm pain and leg pain. Dr. Silva recommended physical therapy. On May 10, 2013, plaintiff underwent an MRI that showed degenerative changes in his cervical spine.

On May 14, 2013, plaintiff returned to Dr. Silva who reviewed the MRI results with him. Plaintiff stated that he still had a "frequent sensation of either knee giving out making him dependent on a cane to maintain stability." R. 494. Dr. Silva again found that plaintiff had full motor strength in upper and lower extremities as well as normal sensation. As for the disc issue, he recommended that plaintiff continue with medications and referred him to the Rockford Spine Center.

On May 30, 2013, plaintiff visited Dr. Silva, and continued to report leg weakness. Dr. Silva made the following comment, which the ALJ would later rely on:

> [Patient] states he has not been able to go to spine surgery consult due to cost of visit; he was told [the] RSC is not able to take Township of Rockford payments. This is not the statement in [a] letter received from RSC, stating that [patient] declined the appointment.

3

R. 488. In the "Examination" section of the report, Dr. Silva noted that plaintiff had 5/5 motor strength in upper and lower extremities, along with normal sensation. *Id.* Around this same time, Dr. Silva also completed a 3-page social security form entitled "Arthritic Report." He noted that plaintiff would need his cane for "long walks" and "uneven terrain." R. 328. In response to the question about how long plaintiff could sit or stand at a stretch, Dr. Silva wrote: "unable to test in clinic." R. 328. He wrote this phrase several other times in the report.

On June 11, 2013, plaintiff visited Dr. Silva, reporting (among other things) that the abdominal wound had healed. Plaintiff reported that his physical therapy sessions had been halted allegedly "due to [his] therapist[']s concern about possible risk of worsening disc protrusion." R. 486. This statement is discussed further below.

On August 2, 2013, plaintiff saw Dr. Chu, a neurosurgeon. Dr. Silva had referred plaintiff to him. Dr. Chu examined plaintiff and found that he had normal motor strength and a negative straight leg raising test. He reviewed plaintiff's MRI and noted that he had "degenerative disc disease with disc bulges, with lumbar stenosis." R. 393.

Plaintiff's doctor visits continued through the rest of 2013 and into 2014. In 2014, he saw a nurse at Crusader, Tamara Wojciechowski, for pain management. She prescribed different pain medications. There was an ongoing issue with the fact that plaintiff tested positive several times for marijuana, which limited the pain medications she could prescribe.

A hearing was held before the ALJ on November 20, 2014. Plaintiff was 52 years old. He testified that he last worked at "a fast food joint where [he] had to make orders as they [came] in, breakfast, lunch, and sometimes dinner." R. 32. He had to stand on the job and lifted, by his own estimate, 50 to 60 pounds. The ALJ and plaintiff then discussed the fact that this job ended because plaintiff went to jail for 18 months. There was then discussion about plaintiff's two

4

surgeries and also his back problems. Plaintiff described his back pain as "excruciating" and rated it as 10 on a 10-point scale. R. 37. He testified that the pain had been at this level since 2009. The ALJ noted that, despite this pain, plaintiff "somehow managed to keep working the cook job." R. 38. Plaintiff answered "yes."

In addition to his back and abdominal problems, plaintiff also referred to other problems, including arm pain, headaches, and chronic obstructive pulmonary disease. The ALJ asked plaintiff whether the headaches were ever so bad that plaintiff could not get out of bed. Plaintiff stated that he had such headaches five times a week. R. 49. Plaintiff admitted to being a smoker, but only smoked "like one cigarette a week." R. 47.

On March 27, 2015, the ALJ found plaintiff not disabled. The ALJ found that plaintiff had the following severe impairments: "cervical and lumbar degenerative disc disease with stenosis, impingement and mild retrolisthesis, status post abdominal wall mass resection and asthma." R. 15. The ALJ found that plaintiff did not meet any listing. In the residual functional capacity analysis, the ALJ found that plaintiff could do light work.

## DISCUSSION

Plaintiff's arguments for remand are not neatly organized into formal sections. The Court discerns three major arguments, which are that the ALJ (1) mocked plaintiff's statements, (2) "played doctor" in interpreting the evidence, and (3) failed to follow the treating physician rule.

The first argument is somewhat atypical. Rather than simply arguing that the ALJ made errors in interpreting the evidence, plaintiff makes a broader claim by accusing the ALJ of "mocking" plaintiff's statements. Plaintiff's main gripe appears to be that the ALJ mentioned plaintiff's incarceration and limited work history. The underlying premise seems to be that the ALJ unfairly prejudged plaintiff based on the fact that he went to prison in 2010 and then filtered

5

all the evidence through this biased template. In short, according to plaintiff, the ALJ failed to approach the case with an open mind.

The Court is not persuaded by this argument. The Court has read both the hearing transcript and the ALJ's decision and cannot find any statements that employed a mocking tone or were otherwise rhetorically out of line. The Court agrees with the Government's bottom-line assessment that plaintiff "attributes a tone to the ALJ's decision that simply does not exist in the text." Dkt. #10 at 5. To be sure, there are places where the ALJ expressed skepticism about plaintiff's assertions. In fact, this was the central rationale of the decision. But an evaluation of credibility is not improper. As for the specific issues of plaintiff's incarceration and work history, the Court does not find that these references were improper. Plaintiff's incarceration occurred during the relevant period and was the reason plaintiff stopped working. To the extent that the ALJ's discussion of these issues were improper (and the Court does not reach such a conclusion), the ALJ did not belabor the point, making any error harmless. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (the harmless error doctrine applies when the court can conclude with certainty that the ALJ would reach the same conclusion absent the error).

Instead of assessing whether the ALJ used a mocking tone, the better approach is to consider plaintiff's specific criticisms under the traditional disability standards. Under this framework, this Court assesses whether the ALJ relied on substantial evidence, whether the ALJ ignored "lines of contrary evidence," and finally whether the ALJ provided enough "detail and clarity" to enable this Court to "connect the evidence to the conclusion." *Arnett v. Astrue*, 676 F.3d 586, 591-592 (7th Cir. 2012). In his opening brief, plaintiff identified approximately ten statements in the ALJ's decision that were supposedly objectionable. *See* Dkt. #9 at 6-8. As explained below, the Court finds that plaintiff's criticisms mostly boil down to disputes about

how pieces of evidence should be interpreted, with plaintiff overstating or mischaracterizing the ALJ's sentences in many instances. The Court addresses the specific arguments below.

**Cane.** Plaintiff asserts that the ALJ "denied that there was any 'medical explanation for why or how [Mr. Garrett] obtained a cane.'" Dkt. #9 at 6 (quoting ALJ's decision). Plaintiff suggests that the ALJ's statement was erroneous or unjustified in some respect. However, the Court finds that the actual statements made by the ALJ were based on reasonable inferences derived from the medical record. The portion quoted by plaintiff was taken from a longer summary of plaintiff's visits to Dr. Silva in February 2013. Dr. Silva noted that plaintiff reported having "passed out" a few times. R. 295. Dr. Silva then seemed to question plaintiff's explanation for why it happened, stating the following: "When asked to describe the incidents, he states he could not remember what happened during those times." *Id.* Dr. Silva noted that plaintiff "now uses" a cane. Dr. Silva's statement suggests that plaintiff made this decision on his own. There is no suggestion that Dr. Silva prescribed the cane. Dr. Silva further noted that plaintiff reported that his medications at home were not complete, but that he "could not identify which ones are missing." *Id.* Dr. Silva's summary again arguably suggests that he found plaintiff's answers suspicious or at least puzzling. In his examination, Dr. Silva found that plaintiff had full motor strength and sensation. Dr. Silva concluded that plaintiff's passing out and falling had an "unclear etiology." It was based on all these facts that the ALJ concluded that the medical explanation for why plaintiff began using a cane was unclear. Viewed in context, the ALJ's statement was a reasonable interpretation of the record.

**Incisional Infection.** Plaintiff alleges that the ALJ "discounted that Mr. Garret *ever had* an incisional infection." Dkt. #9 at 6 (emphasis added). The incision was from the two surgeries. Here again, plaintiff has taken a statement out of context to suggest that the ALJ was making a

7

broader statement than he seemed to actually be making. In the decision, the ALJ never denied that plaintiff had an incisional infection. To the contrary, he referred to it multiple times. At the same time, the ALJ raised questions about how serious and long-lasting this problem was and whether it had been resolved. This is a valid line of inquiry, especially given that plaintiff, in his opening brief, stated that the incision infection was noted to be "resolved." *See* Dkt. #9 at 4.

**Physical Therapy.** Plaintiff complains that the ALJ "noted that Mr. Garrett did not complete physical therapy but left out that the physical therapist recommended that physical therapy be discountinued [sic] due to the possibility of a worsening disc protrusion." Dkt. 9 at 6-7. It is true that the ALJ did not mention the comment allegedly made by the therapist. However, there is no independent confirmation the therapist ever made such a comment. The only report came from plaintiff who reported this fact to his doctor. This Court could not find any reference in the therapy records indicating that a therapist expressed such a concern. Not only that, but plaintiff engaged in second round of therapy *a year after* this comment supposedly was made. Why would he do so if his therapist told him not to? For these reasons, the ALJ's failure to mention this fact was harmless error. *See Spiva*, 628 F.3d at 353.

**Epidurals.** Plaintiff criticizes the ALJ for supposedly concluding that plaintiff "offered false reasons for failing to undergo lumbar epidurals." Dkt. #9 at 7. This argument again takes the ALJ's statements out of context and reads plaintiff's preferred meaning into them. The ALJ discussed epidurals while summarizing plaintiff's visits to Dr. Chu, a neurosurgeon. The ALJ noted that Dr. Chu twice offered plaintiff an epidural referral, and each time plaintiff declined. This fact is not disputed by plaintiff, and it supports the ALJ's rationale that plaintiff only used conservative treatments. As part of this same discussion, the ALJ noted in a footnote that plaintiff had previously told Dr. Silva that he did not see a spine specialist because the Rockford

Township would not pay for it, but that Dr. Silva "recorded that this excuse was inaccurate." R. 19. Based on this incident, as well as other facts in the record, the ALJ concluded that plaintiff "has not undergone an epidural because pain is not the restrictor he asserts." R. 19. The ALJ never explicitly stated that plaintiff offered "false reasons" for not getting the epidural. The ALJ's point appears to be that plaintiff offered *no explanation* for not getting the epidurals. The Court does not find that the ALJ's analysis was factually inaccurate or legally improper.

**Antibiotic.** Plaintiff complains that the ALJ "essentially accused Mr. Garret of faking an inability to keep down his antibiotic for his abdominal infection, stating that Mr. Garret 'claimed he could not keep food down while on the [antibiotic].'" Dkt. #9 at 6. Plaintiff's argument that the ALJ "essentially accused" plaintiff of faking presumably rests on the inclusion of the word "claimed," which perhaps suggests that the ALJ did not believe plaintiff. But this conclusion rests on an evidentiary sliver. Placed in context, this one sentence, embedded in a much longer summary of many medical visits, is at best harmless error. As discussed elsewhere in this opinion, there is much other evidence to support the ALJ's larger point that plaintiff made statements that were doubted by his doctors.

**Physical Examination Findings.** Plaintiff makes several related criticisms about the ALJ's reliance on physical examination findings made by plaintiff's doctors. The ALJ noted that plaintiff's doctors consistently found that he had a negative straight leg raising test, and that he had full muscle strength and normal sensation. Plaintiff also complains particularly about the following sentence: "Absent loss of disc height, which means no stenosis, mechanical pain cause would not be present." R. 17. Plaintiff accuses the ALJ of "playing doctor" by making multiple medical interpretations. Citing to websites and television reports, plaintiff argues that the examination findings do not necessarily rule out pain, tingling, or leg weakness.

9

Although a few of the ALJ's statements arguably constitute doctor playing, in particular the sentence about loss of disc height, the Court finds that they do not warrant a remand for several reasons. First, in his briefs, plaintiff concedes that these physical examination findings were probative to some degree. For example, plaintiff stated the following about muscle strength: "While the ALJ cited physical examinations with relatively full strength as a reason why Mr. Garret's MRI did not 'correlate' to significant deficits, that does not mean that Mr. Garret was not at least limited to a sedentary job." Dkt. #9 at 8. Plaintiff thus implicitly acknowledged that muscle strength was a relevant factor, but argued that it was not dispositive. In other words, this is an argument about the weight, not the relevance of evidence.[2] Second, plaintiff's treating doctors included these physical findings in their reports, suggesting that thought they were relevant. Third, the ALJ relied on the State agency physician (Dr. Gotway) who cited to similar examination findings including the negative straight leg test.

In sum, the Court does not find that plaintiff's specific criticisms are grounds for remand. Even if there were merit to some of the individual criticisms, plaintiff's argument fails to challenge large portions of the ALJ's decision, which contain *many other findings* supporting the ALJ's rationales. This evidence includes the following: the ALJ noted that plaintiff told doctors that his abdominal pain improved when he moved around and that this was different from his hearing testimony (R. 17); plaintiff told his doctors that his pain was only "on and off" but then stated at the hearing that his pain was constantly at a 10-out-of-10 level (R. 17); plaintiff did not collect medication, suggesting his pain was not significant (R. 17); Dr. Silva detected no abdominal guarding even though plaintiff stated that he had intense pain (R. 17); on several

---

[2] In his reply brief, plaintiff made a similar acknowledgment, stating: "While Mr. Garrett did not have diminished motor strength on examination or a negative SLR on examination, that does not *necessarily mean* he did not have the 'persistent mid to low back pain associated with sensation of legs giving out'[.]" Dkt. #11 at 1-2 (emphasis added). It should be remembered that plaintiff bears the burden of proof on these issues. *Liskowitz v. Astrue,* 559 F.3d 736, 739-40 (7th Cir. 2009).

visits, Dr. Silva did not list back pain as an impairment even though plaintiff later claimed at the hearing that he was experiencing this pain constantly (R. 18); plaintiff told Dr. Chu he had fallen, but Dr. Chu noted that he did not observe any gait or balance issues (R. 18); Dr. Jaradh observed that plaintiff was in "no acute distress and exhibited normal lumbar spine range of motion" at a time when plaintiff stated his pain was "killing him"; R. 19-20; after the second round of physical therapy sessions in October 2014, the therapist stated that plaintiff "should anticipate a good prognosis" (R. 20); plaintiff did not stay in the pain management program (R. 20). Plaintiff offered no rebuttal to these and other findings. Accordingly, the ALJ's credibility findings were supported by substantial evidence.[3]

The Court now turns to plaintiff's final argument that the ALJ wrongly rejected Dr. Silva's three opinions and did so by failing to follow the treating physician rule. According to plaintiff, Dr. Silva's primary findings were that plaintiff "needed to use a cane" and "could not work greater than part-time." Dkt. #9 at 8. As for the failure to follow the treating physician rule, plaintiff is correct that this Court takes the view that ALJs must explicitly apply the checklist. However, this Court has held, on limited occasions, that the failure to do so could be harmless error. *See, e.g.*, *Duran v. Colvin*, 2015 WL 4640877, *10 (N.D. Ill. Aug. 4, 2015) ("the Court chooses to *sua sponte* invoke the harmless error doctrine" because the "Court is confident that remand on this issue is not necessary."). This Court finds this to be such a case.

The ALJ did not ignore Dr. Silva's opinions but instead addressed them in several paragraphs, offering multiple reasons for rejecting them. First, the ALJ found that the reports were internally inconsistent because Dr. Silva identified different ailments, yet each time came to

---

[3] After reviewing the transcript, the Court notes that there were other statements not mentioned by the ALJ that could be viewed with similar skepticism. For example, plaintiff claimed at the hearing that he only smoked one cigarette a week despite telling medical providers that he was a "heavy smoker." R. 468. Plaintiff testified that he had bed-confining headaches five times a week, but there is little in the medical records indicating that he complained about this alleged problem.

11

the same basic conclusions. For example, the ALJ pointed out that on the first Township form, Dr. Silva listed plaintiff's impairments at hypertension and abdominal pain, but then on the second form no longer included these impairments, but listed two new ones: constipation and leg tingling. Second, the ALJ noted that the second Township form was time-limited; the ALJ opined that these impairments would last only two to three months. Third, as for the May 2013 report, the ALJ noted that Dr. Silva's opinions were speculative because, as he noted multiple times, he had not been able to test plaintiff's functional abilities in a clinic. Fourth, on this report, Dr. Silva indicated left elbow pain as a severe impairment, but then then included no reaching, handling, or manipulating restrictions. Based on these multiple reasons, the Court concludes that the ALJ would reach the same result on remand even if the checklist were applied.[4] In his two briefs, plaintiff did not discuss the factors nor articulate how they would lead to a different result on remand. For all these reasons, the Court finds that the ALJ provided a sufficient explanation.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date: August 15, 2017    By: _____
                              Iain D. Johnston
                              United States Magistrate Judge

---

[4] Although not mentioned by the ALJ, the Court notes that Dr. Silva stated that plaintiff needed to use a cane for "long walks" and "uneven terrains." R. 328. It is not clear that either of these scenarios would be present in most light jobs.